Receipt number AUSFCC-10501625

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PTA-FLA, INC.,<br><br>   Plaintiff,<br><br>   v.<br><br>THE UNITED STATES OF AMERICA,<br><br>   Defendant. | Case No. __25-988 C__<br><br>Judge _____ |

## COMPLAINT

Plaintiff PTA-FLA, Inc. brings this suit against the United States for the payment of money to Plaintiff mandated by the Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601–1609) ("Secure Networks Act"), and for breach of an express or implied contract.  Plaintiff seeks $273, 971, 425.71 plus interest from the United States for the breach of its statutory and contractual obligations arising out of the failure of the United States to honor its commitment to reimburse Plaintiff for the costs of removing and replacing equipment in its telecommunications network that the United States considered to be a national security risk.  In support thereof, Plaintiff alleges as follows:

1.      The Secure Network Act established the Reimbursement Program.  47 U.S.C. § 1603(a).  The purpose of the Reimbursement Program is to reimburse providers of advanced communications service for the costs incurred for the removal, replacement, and disposal of covered communications equipment or services that the United States considers to be a national security risk, *i.e.*, communications equipment produced by Huawei Technologies Company (Huawei) or ZTE Corporation (ZTE) that were obtained by providers on or before June 30, 2020.

2.      Plaintiff is a small, minority-owned provider of advanced communications service.  Plaintiff deployed its network using Huawei and ZTE equipment between 2006 and 2008.

3.      The United States, through its agent, the Federal Communications Commission ("FCC"), promised to reimburse Plaintiff if Plaintiff removed the Huawei and ZTE equipment from its network prior to the window for applications under the Reimbursement Program.  In 2020 and 2021, through public statements, webinars, and guidance from the FCC, the United States assured providers like Plaintiff that they would not be penalized and would still qualify for funding if they acted in good faith to begin the removal and replacement process prior to the reimbursement window.  Through its agent, the FCC, the United States promised that it would "allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program, for the removal, replacement, and disposal of covered equipment and services."  *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd 14284, 14340 ¶ 130 (2020) ("*2020 Supply Chain Order*").  During a webinar on September 27, 2021, then-Acting Associate Chief of the FCC's Wireline Competition Bureau, Justin Faulb, stated that reimbursement would be provided for expenses incurred to remove and replace equipment even though the service provider had not actually paid for the replacement equipment because the FCC recognized that small companies lacked the resources to float such expenses while waiting to be reimbursed.  During that same webinar, Special Counsel to the FCC Chairman, Trent Harkrader, underscored the urgency of prompt compliance, stating, "Make no mistake, the time is now to remove this equipment from our networks" and represented that "you will soon receive support."  For networks that could no longer operate after removing the Huawei and ZTE equipment, Mr.

Harkrader indicated in that same webinar that reimbursement would be provided where "in some cases, that will mean starting over from scratch." These public pronouncements urging providers to begin the removal process without delay conveyed the immediacy of the national security concerns and reflected Congress' mandate encouraging quick action to secure the nation's communications supply chain.

4.      Through its performance, Plaintiff accepted the offers and assurances by the United States that Plaintiff would be reimbursed if it began the removal and replacement process and waited to restore its network with replacement equipment prior to the reimbursement application window. Acting in good faith reliance on the United States's representations and directives, Plaintiff incurred substantial expenses dismantling its network, removing the Huawei and ZTE equipment, and waiting until the opening of the application window for the Replacement Program to restore its network with replacement equipment. Plaintiff's reliance was justified by the specific purpose and policy goals of the Secure Networks Act and the express representations by the United States's agent, the FCC, to compensate those who took early action to remove Huawei and ZTE equipment in the interest of national security.

5.      Plaintiff submitted an application requesting reimbursement from the Reimbursement Program for the costs that Plaintiff incurred to remove Huawei and ZTE equipment from its network. Plaintiff satisfied all the eligibility requirements to receive money from the Reimbursement Program.

6.      In breach of the Secure Networks Act and the United States's agreement to reimburse Plaintiff if Plaintiff removed the Huawei and ZTE equipment from its network, the United States, through its agent, the FCC, denied Plaintiff's application and deprived Plaintiff of any reimbursement for the substantial costs it incurred at the urging of the United States. The

United States is liable for the breach of its statutory and contractual obligations.  Therefore,

Plaintiff is entitled to receive payment from the United States in the amount of $273,971,425.71

plus interest as reimbursement for the equipment removal and replacement expenses.

**JURISDICTION AND VENUE**

7.      The United States Court of Federal Claims has jurisdiction and is the proper

venue for this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because this suit against

the United States for the payment of money is founded upon a money-mandating statute, the

Secure Networks Act, and the United States's breach of an express or implied contract.

8.      The United States may not be sued without its consent, and consent is a necessary

condition for jurisdiction to exist.  *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  A waiver

of sovereign immunity must be unequivocally expressed in statutory text.  *Maine Comty. Health

Options v. United States*, 590 U.S. 296, 322 (2020).   The waiver must extend unambiguously to

monetary claims.  *United States v. Nordic Village, Inc*., 503 U.S. 30, 34 (1992).

9.      Tucker Act jurisdiction requires not only a claim against the United States but also

requires that there be a separate substantive right—a money-mandating statute or constitutional

provision that has been violated, or an express or implied contract with the United States.  *Maine

Comty. Health Options v. United States*, 590 U.S. at 322.  The United States has consented to

suits for money in the Court of Federal Claims through the Tucker Act for "any claim against the

United States founded either upon the Constitution, or any Act of Congress, or any regulation of

an executive department, or upon any express or implied contract with the United States."  28

U.S.C. § 1491.  "In determining whether the Court of Federal Claims has jurisdiction, all that is

required is a determination that the claim is founded upon a money-mandating source and the

plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to

recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

10.      A "fair interpretation" test is employed to determine whether a statutory claim falls within the Tucker Act's immunity waiver.  *Maine Comty. Health Options v. United States*, 590 U.S. at 322.   The Secure Networks Act is "fairly interpreted" as mandating compensation for the removal, replacement, and disposal of covered communications equipment *i.e.*, communications equipment produced by Huawei or ZTE.  The fact that the FCC's staff did not determine that Plaintiff was eligible to receive reimbursement does not render the Secure Networks Act not money-mandating.  "The fact that the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides. It is the statute, not the Government official, that provides for the payment." *112 Genesee Street, LLC. v. United States*, 172 Fed. Cl. 426, 447 n.8 (Fed. Cl. 2024) (quoting *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005)).

11.      The "shall pay" statutory text confirms that the FCC lacked discretion under the Secure Networks Act as to whether to pay money to specific applicants.  Furthermore, the statute granted each eligible applicant an individual right to receive money.  47 U.S.C. § 1603's double mandate—that the FCC "shall establish a reimbursement program" and "shall make reasonable efforts to ensure that reimbursement funds are distributed equally among all applicants"— confirms that the Secure Networks Act is a money-mandating statute for Tucker Act jurisdiction. As Plaintiff is a small provider of advanced communications service that was compelled to remove equipment produced by Huawei or ZTE from its network and was induced by the United States to participate in the Secure Networks Act's Reimbursement Program, Plaintiff is within

the class of plaintiffs entitled to receive monetary reimbursement under the Secure Networks

Act.

12.    For the Court of Federal Claims to have jurisdiction over Plaintiff's claim that the

United States has breached its agreement to reimburse Plaintiff for the removal, replacement, and

disposal of equipment produced by Huawei or ZTE, a valid contract must only be pleaded, not

ultimately proven. *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1334 (Fed. Cir.

2007) (citation omitted). The government's offer can be memorialized in documents that, when

read together, could provide evidence of an intent to contract. *White v. United States*, 175 Fed.

Cl. 226, 235 (Fed. Cl. 2025) (quotation and citation omitted). In this case, the Secure Networks

Act, the FCC's public statements, the FCC's webinars, and the FCC's application form show the

United States's intent to contract and reimburse Plaintiff if Plaintiff accepted that offer. Plaintiff

accepted the United States's offer by dismantling its network, removing the Huawei and ZTE

equipment, waiting until the opening of the application window for the Replacement Program to

restore its network with replacement equipment, and applying on the FCC's form for

reimbursement. This Court has jurisdiction over Plaintiff's contract claim because Plaintiff is

within the class of plaintiffs entitled to recover for the United States's breach of its agreement to

reimburse Plaintiff.

13.    The Tucker Act jurisdiction of the Court of Federal Claims cannot be displaced by

another statute unless "Congress explicitly meant to withdraw the Tucker Act jurisdiction."

*Qwest Corp. v. United States*, 48 Fed. Cl. at 686. The withdrawal of Tucker Act jurisdiction by

implication is also disfavored, which means that the Tucker Act's waiver of sovereign immunity

is not displaced unless the text of another money-mandating statute indicates an unambiguous

intent to displace the Tucker Act. *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d at 1336.

14.     Neither the Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. §

2342(1), the Communications Act, 47 U.S.C. § 402(a), nor the Administrative Procedure Act

("APA"), 5 U.S.C. § 702, are money-mandating statutes that displace the Tucker Act.  Absent

from those statutes is any text that "unequivocally" expresses a waiver of sovereign immunity to

bring a suit against the United States for the payment of money.  *Maine Comty. Health Options v.*

*United States*, 590 U.S. at 322.  "Ambiguity exists if there is a plausible interpretation of the

statute that would not authorize money damages against the Government."  *F.A.A. v. Cooper*, 566

U.S. 284, 290-91 (2012).  Because the text of these three statutes do not refer to the Tucker Act

or mention the waiver of sovereign immunity to bring claims against the United States for the

payment of money, they "cannot be construed to reflect an unambiguous intention to withdraw

the Tucker Act remedy."  *Altair Glob. Credit Opportunities Fund, LLC v. United States*, 138 Fed.

Cl. 742, 755 (Fed. Cl. 2018) (citation omitted).

15.     The Hobbs Act says that an appropriate court of appeals has "exclusive

jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ...

final orders of the Federal Communication Commission made reviewable by section 402(a) of

title 47." 28 U.S.C. § 2342(1); *see* the Communications Act, 47 U.S.C. § 402(a) (making

reviewable certain "order[s] of the Commission under" the Communications Act.  There is no

reference in the statutory text of the Hobbs Act or the Communications Act to the Tucker Act or

the waiver of sovereign immunity to bring a claim against the United States for the payment of

money.  In this case, Plaintiff is not seeking "to enjoin, set aside, suspend (in whole or in part), or

to determine the validity of" any FCC order.  The judicial review provided by the APA is also

limited to "relief other than money damages."   5 U.S.C. § 702.

16.     The judicial review remedy provided by the Hobbs Act cannot be read as an unequivocal waiver of sovereign immunity for suits against the United States. *Dinh v. United States*, 166 Fed. CL. 513, 525 n.9 (Fed. Cl. 2023) (holding that the Court of Federal Claims has jurisdiction over suits against the United States even though another court has exclusive jurisdiction for the judicial review of an agency order). This case is a suit against the United States for the payment of money, but not a suit against the FCC. Judicial review under the Hobbs Act does not provide Plaintiff with a remedy against the United States for the payment of money.

17.     Neither the Communications Act nor the Hobbs Act review of FCC orders under the Communications Act were intended to withdraw the remedies sought by Plaintiff. "The Tucker Act and the Telecom Act are perfectly capable of co-existence." *Qwest Corp. v. United States*, 48 Fed. Cl. at 686. Section 414 of the Communications Act explicitly preserves common law contract claims. Section 414 of the Communications Act states that "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

18.     During another case involving Hobbs Act and APA review of an FCC order under the Communications Act, the D.C. Circuit held that the Court of Federal Claims, not the D.C. Circuit, has jurisdiction to decide contract claims against the United States. *Northpoint Tech., Ltd., v. FCC*, 414 F.3d 61, 76 (D.C. Cir. 2005) (holding that if "the FCC violated an agreement with the company, that is a Tucker Act matter, see 28 U.S.C. § 1491, and not for review in this APA proceeding"). There is no reference in the Hobbs Act, the Communications Act, or the APA to the Tucker Act, contract claims against the United States, or suits against the United States for the payment of money. Instead, the waiver of sovereign immunity provided by those statutes is

limited to judicial review, non-monetary remedies, and equitable relief, such as enjoining, setting aside, or suspending an FCC order.  In a recent decision involving judicial review of a federal agency order, the Supreme Court confirmed that only the Court of Federal Claims has jurisdiction over suits based upon any express or implied contract with the United States.  *Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025).  Plaintiff does not seek judicial review or any non-monetary remedy in this case under the Hobbs Act, the Communications Act, or the APA.

19.     Because the text of the Hobbs Act, the Communications Act, and the APA do not reflect Congress's unambiguous intent to displace Tucker Act jurisdiction for suits against the United States for the payment of money, this Court has jurisdiction over all of Plaintiff's claims.

## PARTIES

20.     Plaintiff PTA-FLA, Inc. is a small, minority-owned provider of advanced communications that removed equipment produced by Huawei or ZTE from its network in accordance with the Secure Networks Act.

21.     Defendant is the United States of America.

## STATEMENT OF FACTS

22.     PTA-FLA provided advanced communications service to approximately 4,000 customers in Florida, West Tennessee, and South Carolina using Huawei and ZTE equipment in its telecommunications network.  Plaintiff offered its customers unlimited voice and data services for $30 per month.

23.     When Congress was considering the threat of covered equipment to national security, it determined that the "United States … has a clear interest in mitigating threats posed by vulnerable communications equipment and services."  H.R. REP. 116-352, 9, 2020 U.S.C.C.A.N. 102, 103.  Congress was particularly concerned that "Chinese telecommunications

firms, including Huawei Technologies Co. Ltd (Huawei) and its affiliates, [pose] significant threats to U.S. commercial and security interests. Their susceptibility to state influence over business operations results in China having the means, opportunity, and motive to use telecommunications companies for malicious purposes, such as espionage and cyberattacks." *Id.*

24.     In order to address the clear threat to national security, Congress enacted the Secure Networks Act, and the "objective of this legislation is to prohibit the use of vulnerable communications equipment or services and establish a program to reimburse eligible carriers for the costs of replacing such vulnerable equipment or services with trusted, comparable communications equipment or services." H.R. REP. 116-352, 11, 2020 U.S.C.C.A.N. 102, 106.

25.     In 2019, Congress enacted the Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020), codified at 47 U.S.C. §§ 1601–1609 (the "Secure Networks Act"). The Secure Networks Act created the Reimbursement Program to support providers in removing and replacing covered communications equipment that posed a national security risk.

26.     The Secure Networks Act authorized reimbursement to eligible providers for reasonable expenses incurred in permanently removing, replacing, and disposing of covered equipment and services.

27.     47 U.S.C. § 1603 mandates that the United States's agent, the  FCC, "shall establish a reimbursement program" and "shall make reasonable efforts to ensure that reimbursement funds are distributed equally among all applicants."

28.     Should the FCC determine that an application is materially deficient, the Secure Networks Act states that the FCC "shall provide the applicant a 15-day period to cure the defect." 47 U.S.C. § 1603(d)(3)(B).

29.     Should the FCC deny an application, the Secure Networks Act prohibits the FCC

from preclude[ing] the applicant from resubmitting the application or submitting a new

application for a reimbursement under the Program at a later date." 47 U.S.C. § 1603(d)(3)(C).

30.     In early 2020 and 2021, the FCC and its leadership publicly urged providers to

begin the removal process without delay, highlighting the urgent national security concerns posed

by covered equipment.  Through its agent, the FCC, the United States promised that it would

"allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and

funding of the Reimbursement Program, for the removal, replacement, and disposal of covered

equipment and services."  *Protecting Against National Security Threats to the Communications*

*Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd 14284, 14340 ¶

130 (2020) ("*2020 Supply Chain Order*").

31.     The FCC praised providers that removed the Huawei and ZTE equipment from

their networks prior to the establishment of the Reimbursement Program and assured them they

would receive reimbursement.  *2020 Supply Chain Order,* 35 FCC Rcd at 14340 ¶ 130 ("Some

providers have already started the process to remove and replace problematic equipment from

Huawei and ZTE from their networks.  We applaud these providers for proactively taking steps

to increase the security of their networks notwithstanding the uncertainty of Federal government

assistance.  As such, we will allow providers to obtain reimbursement for costs reasonably

incurred prior to the creation and funding of the Reimbursement Program, for the removal,

replacement, and disposal of covered equipment and services").

32.     Through its agent, the FCC, the United States produced a webinar on September

27, 2021 confirming that providers who acted in good faith to begin the removal and replacement

process prior to the reimbursement application window would not be penalized and could still

qualify for funding.  FCC staff emphasized that reimbursement eligibility could include expenses

incurred before the program formally launched, so long as the provider met the other statutory

criteria.  During that webinar, then-Acting Associate Chief of the FCC's Wireline Competition

Bureau, Justin Faulb, stated that reimbursement would be provided for expenses incurred to

remove and replace equipment even though the service provider had not actually paid for the

replacement equipment because the FCC recognized that small companies lacked the resources

to float such expenses while waiting to be reimbursed.  This reinforced that providers like

Plaintiff, who acted promptly to secure their networks based on the United States's urging, were

intended to be eligible participants.

33.     Notably, during the same webinar, then-Special Counsel to the FCC Chairman,

Trent Harkrader, underscored the urgency of prompt compliance, stating, "Make no mistake, the

time is now to remove this equipment from our networks" and represented that "you will soon

receive support."  For networks that could no longer operate after removing the Huawei and ZTE

equipment, Mr. Harkrader indicated in that same webinar that reimbursement would be provided

where "in some cases, that will mean starting over from scratch."  This directive made clear that

the United States not only supported—but expected—early action.

34.     By January, 2022,  Plaintiff, acting in good faith reliance on these government

representations and directives, dismantled its network and removed substantially all of the

Huawei and ZTE equipment in advance of final establishment of the Reimbursement Program,

incurring substantial expenses.

35.      Through its performance, Plaintiff accepted the offers and assurances by the

United States that Plaintiff would be reimbursed if it began the removal and replacement process

prior to the reimbursement application window.  Acting in good faith reliance on the United

States's representations and directives, Plaintiff incurred substantial expenses dismantling its network, removing the Huawei and ZTE equipment, and waiting until the opening of the application window for the Replacement Program to restore its network with replacement equipment. Plaintiff's reliance was justified by the specific purpose and policy goals of the Secure Networks Act and the express representations by the United States's agent, the FCC, to compensate those who took early action to remove Huawei and ZTE equipment in the interest of national security.

36.     On January 23, 2022, Plaintiff submitted an application on FCC Form 5640, certified by Plaintiff under penalty of perjury, requesting reimbursement from the Reimbursement Program for the costs that Plaintiff incurred to remove Huawei and ZTE equipment from its network. Plaintiff satisfied all the eligibility requirements to receive money from the Reimbursement Program. Plaintiff fully complied with the statute, rules, and the FCC's program guidance and certified under penalty of perjury on FCC Form 5640 that Plaintiff would "comply with the statute, rules, and orders governing the Reimbursement Program." The eligibility requirements that Plaintiff satisfied included, but were not limited to, the customer-size threshold, the lawful acquisition of covered equipment prior to June 30, 2020, and the submission of detailed cost estimates.

37.     On July 15, 2022, the FCC denied Plaintiff's application for reimbursement relying upon an erroneous interpretation of the term "provider" in the Secure Networks Act. The FCC apparently believes that Plaintiff's network should have been operational at the time it submitted its application for reimbursement although it is impossible for a provider like Plaintiff that dismantled its network early as encouraged by the FCC, removed the Huawei and ZTE equipment, and waited until the opening of the application window to restore its network with

replacement equipment to have an operational network at the time it submitted its application. As a condition of receiving money from the Reimbursement Program, the FCC Form 5640 required Plaintiff to agree under penalty of perjury that Plaintiff would "not purchase, rent, lease, or otherwise obtain covered communications equipment" to restore the operations of its network. Therefore, a company that waits until the opening of the application window for the Replacement Program before restoring its network with replacement equipment, rather than reinstall the Huawei and ZTE equipment it had removed, is within the class of "providers" entitled under the Secure Networks Act to reimbursement.

38.     Requiring Plaintiff to re-install the Huawei and ZTE equipment into Plaintiff's network as a prerequisite to approving Plaintiff's reimbursement application is contrary to the text and purpose of the Secure Networks Act.

39.     Plaintiff had only temporarily taken its network offline in the past, not as a permanent cessation of service.  During this time, Plaintiff continued to pay for tower leases, maintain its infrastructure, and preserve its operational capabilities.  The network could have resumed operations promptly should the United States have reimbursed Plaintiff as mandated by the Secure Networks Act.  Plaintiff's affiliates with networks that did not rely solely upon equipment from Huawei and ZTE did not dismantle their networks and continued to provide advanced communications service to customers without interruption.

40.     Other than Plaintiff, very few, if any, other company has grounds for asserting a claim in this Court for the failure of the United States to comply with the Secure Networks Act.

41.     In violation of 47 U.S.C. § 1603(d)(3)(B), the United States failed to provide Plaintiff with a 15-day period to cure any defect in its application for reimbursement

42.     In violation of 47 U.S.C. § 1603(d)(3)(C), the United States precluded Plaintiff from resubmitting its application or submitting a new application for a reimbursement at a later date.

43.     In violation of 47 U.S.C. §§ 1603(a) and (d)(5)(A), the United States failed to "make reasonable efforts to ensure that reimbursement funds are distributed equally among all applicants."

44.     The United States's denial of reimbursement contradicts the Secure Networks Act's purpose and penalizes Plaintiff for complying promptly with the federal directive.  Denying reimbursement to those who acted quickly undercuts the national security purpose of the statute and disincentivizes prompt compliance in future emergency response programs.  Providers cannot be expected to maintain active customers on a network that is actively being dismantled or has been dismantled  and is being rebuilt pursuant to the United States' own directives.  To do so would compromise service integrity and defeat the very objectives of the Secure Networks Act.

45.     By depriving Plaintiff of any reimbursement for the substantial costs Plaintiff incurred in accordance with the Secure Networks Act and at the urging of the United States, the United States breached the Secure Networks Act and the United States's agreement to reimburse Plaintiff if Plaintiff removed the Huawei and ZTE equipment from its network.  The United States is liable for the breach of its statutory and contractual obligations.  Therefore, Plaintiff is entitled to receive payment from the United States in the amount of $273,971,425.71 plus interest as reimbursement for the equipment removal and replacement expenses.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Money-Mandating Statute,**
**the Secure Networks Act (47 U.S.C. §§ 1601–1609)**

46.    Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

47.    The Secure Networks Act is a money-mandating statute that entitles eligible providers to reimbursement of reasonably incurred costs of removing and replacing Huawei and ZTE equipment.

48.    The "shall pay" statutory text of the Secure Networks Act confirms that the United States lacked discretion as to whether to pay money to specific applicants.

49.    In full compliance with the Secure Networks Act, Plaintiff removed Huawei and ZTE equipment from its network, incurring substantial costs, and submitted an application with the FCC for reimbursement.

50.    Plaintiff is within the class of providers that the Secure Networks Act intended to protect and support through reimbursement.

51.    Plaintiff is a small provider of advanced communications service that was compelled to remove equipment produced by Huawei or ZTE from its network and was induced by the United States to participate in the Secure Networks Act's Reimbursement Program.

52.    The United States, through its agent, the FCC, denied Plaintiff's application for reimbursement.

53.    The United States's denial of reimbursement to Plaintiff violated the Secure Networks Act.

54.     The United States violated 47 U.S.C. §§ 1603(a) and (d)(5)(A) by failing to "make reasonable efforts to ensure that reimbursement funds are distributed equally among all applicants."

55.     The United States violated 47 U.S.C. § 1603(d)(3)(B) by failing to provide Plaintiff with a 15-day period to cure any defect in its application for reimbursement.

56.     The United States violated 47 U.S.C. § 1603(d)(3)(C) by precluding Plaintiff from resubmitting its application or submitting a new application for a reimbursement at a later date.

57.     Plaintiff sustained money damages as a result of the United States's wrongdoing. Plaintiff is entitled to receive payment from the United States in the amount of $273,971,425.71 plus interest as reimbursement for the equipment removal and replacement expenses.

## COUNT II

### Breach of Contract

58.     Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

59.     Plaintiff entered into a valid, enforceable contract with the United States following the establishment of the Reimbursement Program.

60.     All parties mutually intended to be bound in contract.

61.     The United States's offer can be memorialized in documents that, when read together, provide evidence of an intent to contract. *White v. United States*, 175 Fed. Cl. 226, 235 (Fed. Cl. 2025) (quotation and citation omitted). In this case, the Secure Networks Act, the FCC's public statements, the FCC's webinars, and the FCC's application form show the United States's intent to contract and reimburse Plaintiff for removal of the equipment produced by Huawei or ZTE if Plaintiff accepted that offer by removing such equipment from its network and

signing FCC Form 5640 agreeing under penalty of perjury that Plaintiff would "not purchase, rent, lease, or otherwise obtain covered communications equipment" to restore the operations of its network.

62.    The United States agreed, that in exchange for Plaintiff's removal of the Huawei and ZTE equipment from Plaintiff's network and signing FCC Form 5640 agreeing under penalty of perjury that Plaintiff would "not purchase, rent, lease, or otherwise obtain covered communications equipment" to restore the operations of its network, the United States would "make reasonable efforts to ensure that reimbursement funds are distributed equally among all applicants." 47 U.S.C. §§ 1603(a), 1603(d)(5)(A).

63.    There was no ambiguity in the United States's offer, nor in the acceptance of that offer by Plaintiff.

64.    The United States made this offer by authorizing the Reimbursement Program by statute, promulgating regulations governing claimant eligibility and compensation, establishing methodologies and publishing information concerning the manner in which claimant reimbursement expenses would be calculated, and creating claim forms (FCC Form 5640) that enabled applicants to pursue reimbursement.

65.    The United States required Plaintiff to sign and verify under penalty of perjury the accuracy of the information provided on the claim form, FCC Form 5640, as a prerequisite to receiving reimbursement.  Plaintiff signed and verified FCC Form 5640 under penalty of perjury.

66.    As a prerequisite to receiving reimbursement, the United States required Plaintiff to acknowledge on the FCC Form 5640 that incorrect information provided in the form could subject Plaintiff to punishment by fine or forfeiture under the

Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or could lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812).  Plaintiff signed that acknowledgement when it submitted the FCC Form 5640.

67.     Plaintiff accepted the United States's offer by dismantling its network, removing the Huawei and ZTE equipment, agreeing to "not purchase, rent, lease, or otherwise obtain" Huawei and ZTE equipment to restore the operations of its network and applying for reimbursement by signing FCC Form 5640 and agreeing to the many terms and conditions set forth on FCC Form 5640.

68.     Plaintiff's acceptance of the United States's offer was unambiguous.

69.     Plaintiff and the United States provided consideration to facilitate the parties' contractual engagement.

70.     Plaintiff provided consideration by signing and agreeing to the terms of the FCC Form 5640 and removing the Huawei and ZTE equipment from its network.

71.     The United States provided consideration with its promise to reimburse Plaintiff for the removal and replacement of the Huawei and ZTE equipment.

72.     The FCC, on behalf of the United States, had the authority to bind the United States in contract.

73.     Through its public statements, webinars, and guidance, the United States, through its agent, the FCC, created not only a reasonable expectation, but a compelling one, that early compliance with its directive would be reimbursed. The entire structure of the program—enacted by statute, formalized by rule, and publicly endorsed by agency leadership—was built to achieve

one purpose: the removal of covered equipment from U.S. networks.  Plaintiff relied in
good faith on these FCC representations and promises.

74.    These representations included strong and public calls for urgent action.
Through its agent, the FCC, the United States promised that it would "allow providers to
obtain reimbursement for costs reasonably incurred prior to the creation and funding of
the Reimbursement Program, for the removal, replacement, and disposal of covered
equipment and services." *Protecting Against National Security Threats to the
Communications Supply Chain Through FCC Programs*, Second Report and Order, 35
FCC Rcd 14284, 14340 ¶ 130 (2020) ("*2020 Supply Chain Order*").  During a webinar
on September 27, 2021, Special Counsel to the FCC Chairman, Trent Harkrader,
indicated that reimbursement would be provided for networks that could no longer
operate after removing the Huawei and ZTE equipment, recognizing that "in some cases,
that will mean starting over from scratch."  During that same webinar, then-Acting
Associate Chief of the FCC's Wireline Competition Bureau, Justin Faulb, stated that
reimbursement would be provided for expenses incurred to remove and replace
equipment even though the service provider had not actually paid for the replacement
equipment because the FCC recognized that small companies lacked the resources to
float such expenses while waiting to be reimbursed.  Mr. Harkrader also underscored the
urgency of prompt compliance during that webinar, stating, "Make no mistake, the time is
now to remove this equipment from our networks" and represented that "you will soon
receive support,"  further reinforcing the United States's clear expectation that providers
should act without delay.

75.      Plaintiff relied on these communications by the United States and took action at significant expense.  This reliance was not only foreseeable, but it was encouraged.  The FCC's statutory mandate, public orders, and consistent messaging made clear that eligible expenses, even those incurred before formal applications opened, would be honored.  Plaintiff's reliance was justified by the specific purpose of the Secure Networks Act, the policy directives of the FCC, and the program's express intent to compensate those who took early action to remove covered equipment in the interest of national security.

76.      The Secure Networks Act, the FCC's representations and assurances, the FCC's webinar, Plaintiff's signing of the FCC's application form, FCC Form 5640, and Plaintiff's performance in removing the Huawei and ZTE equipment and agreeing to "not purchase, rent, lease, or otherwise obtain" Huawei and ZTE equipment to restore the operations of its network created a contract obligating the United States to compensate Plaintiff.

77.      The United States breached its contract with Plaintiff by failing to reimburse Plaintiff.

78.      Plaintiff sustained money damages as a result of the United States's breach of its contract with Plaintiff.  Plaintiff is entitled to receive payment from the United States in the amount of $273,971,425.71 plus interest as reimbursement for the equipment removal and replacement expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against the United States, as follows:

A.      Enter a judgment declaring that the United States violated the Secure Networks Act by failing to reimburse Plaintiff;

B.     Enter a judgment declaring that Plaintiff entered into an enforceable contract with the United States that the United States breached;

C.     Enter an award to Plaintiff of $273,971,425.71 plus interest in money damages for the costs associated with the removal and replacement of the Huawei and ZTE equipment;

D.     Award other relief that the Court deems just and proper.

Dated: June 12, 2025

Respectfully submitted,


*/s/ Tony S. Lee*
Tony S. Lee
James U. Troup
FLETCHER, HEALD & HILDRETH
1300 N. 17th Street, 11th Floor
Arlington, VA 22209
Telephone: (703) 812-0400
Facsimile: (703) 812-0486
Email: lee@fhhlaw.com
troup@fhhlaw.com

Counsel of Record to Plaintiff PTA-FLA, Inc.